

FILED

AO-106 (Rev: 06/09)-Application for Search Warrant

MAY 1 9 2022

**Mark C. McCartt, Clerk**
**U.S. DISTRICT COURT**

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

In the Matter of the Search of
*BLUE APPLE I-PHONE, Currently Stored at 8023 E.63rd*
*Place, SUITE 300, TULSA, OK, 74133*

)
)
)
)
)

Case No. 22-MJ-331-SH

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1151, 1152, and 1113 | Attempted Murder in Indian Country |
| 18 U.S.C. §§ 1151, 1152, and 1201 | Kidnapping in Indian Country |
| 18 U.S.C. §§ 1151, 1152, and 2111 | Robbery in Indian Country |
| 18 U.S.C. §§ 371 | Conspiracy to Commit Federal Offense |
| 18 U.S.C. §§ 924(o) | Conspiracy to Possess Firearms in Furtherance of a Crime of Violence |

The application is based on these facts:

**See Affidavit of Bennett E. Forrest, attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Bennett E. Forrest, Special Agent**
*Printed name and title*

Sworn to before me and signed ~~in my presence.~~ by telephone

Date: 5/19/22

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

**Susan E. Huntsman, U.S. Magistrate Judge**
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of<br>BLUE APPLE I-PHONE, Currently<br>Stored at 8023 E.63rd PLACE,<br>SUITE 300, TULSA, OK, 74133 | Case No. _____<br><br>**<u>FILED UNDER SEAL</u>** |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Bennett E. Forrest, a Special Agent with the Federal Bureau of Investigation, (FBI), being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I have been a Special Agent with the FBI for approximately twelve (12) years. I have received training concerning and been involved in the investigations of numerous federal offenses.

3. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1151, 1152, and 1113 (Attempted Murder in Indian Country); 18 U.S.C. §§ 1151, 1152, and 1201 (Kidnapping in Indian Country); 18 U.S.C. §§ 1151, 1152, 2111 and 2 (Robbery in Indian Country); 18 U.S.C. § 371 (Conspiracy to Commit a Federal Offense); and 18 U.S.C. § 924(o) (Conspiracy to Possess Firearms in Furtherance of a Crime of Violence) involving CHRISTOPHER ANTONIO PRICE, AKA "Quartertop," (hereinafter referred to as "PRICE,"), "Tashonna L. ANDERSON, AKA "ISYSS," JAIDEN ANTHONY WALTERS, AKA "Drama" (hereinafter referred to as "WALTERS"), and Terrance Lamont MAYS, AKA: "Meatball" (hereinafter referred to as "MAYS") that will be located in the electronically stored information described in Attachment B and is recorded on the device described in Attachment A.

**Identification of the Device to be Examined**

2

5. The property to be searched is a blue Apple iPhone, contained in a blue iPhone protective case, hereinafter the "Device." The Device is currently located at the Federal Bureau of Investigation (FBI), Tulsa Resident Agency (TRA), 8023 E. 63rd Place, Tulsa, Oklahoma, 74137.

6. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

### Background: August 10, 2021, Ezekiel Love Incident

7. On August 10, 2021, at about 6:54 AM, Jenks Police Department (JPD) responded to a medical incident at 9600 S. Hwy 75 in Jenks, OK, which is within the established boundaries of the Muscogee Creek Nation reservation. Upon arrival, they located Ezekiel Octavion LOVE (hereinafter referred to as "LOVE"), lying in the grass with a shirt covered in blood next to him. Love explained that earlier in the morning, several males kidnapped him and placed him into the trunk of a vehicle. Love explained that he managed to jump out of the trunk of the vehicle on Hwy 75 in Jenks, OK and was subsequently shot eight times. LOVE advised that he was shot in the lower back and could no longer move his legs. LOVE said he had been at this location for several hours before the police arrived. Jenks PD notified medical personnel who arrived at the scene and provided medical treatment to LOVE. After JPD initiated their investigation, JPD notified the FBI of the incident since LOVE is

3

an enrolled member of the Muscogee (Creek) Nation. As such, the FBI initiated their

own investigation on the incident. Through the course of the investigation,

Investigators learned the following:

8. On August 10, 2021, Love was driving an AVIS Rental Car (2021 Toyota

Camry, bearing Oklahoma License Plate LDH740). At approximately 12:52 AM,

per vehicle tracker information (Volunteered AVIS Rental Car Agency Information),

LOVE traveled at about 12:22 AM, from the QuikTrip (QT) convenience store

located at 3230 E. Admiral Place North, Tulsa, Oklahoma to 2033 East 133rd Place

South, Bixby, Oklahoma, 74008. According to a former confidential source

intimately familiar with LOVE ("CS"), LOVE explained that he drove to Bixby to

meet with ANDERSON.

9. Case agents verified that ANDERSON is also an enrolled member of the

Muscogee (Creek) Nation and her residence, 2033 East 133rd Place South, Bixby,

Oklahoma, is within the established boundaries of the Muscogee Creek Nation

reservation. PRICE, WALTERS, and MAYS are non-Indian.

10. According to the "CS," after LOVE arrived at the residence, he entered

the residence to use the restroom. While in the restroom, ANDERSON let five (5)

subjects into the residence, including PRICE, WALTERS, and MAYS. The five (5)

subjects then entered into the restroom and assaulted Love. During the assault, the

subjects stripped LOVE of his clothing, Lacoste watch, diamond stud earrings,

Apple I-Phone, prescription eye-glasses, white t-shirt, and blue-jeans. They then

restrained LOVE with duct-tape and zip-ties, and loaded him into the trunk of

4

LOVE's rented 2021 Toyota Camry, bearing Oklahoma License Plate: LDH-740. The AVIS rental car tracker shows that the victim's vehicle remained at 2033 E 133rd Place, Bixby, OK 74088 for approximately one hour and 46 minutes.

11. On August 13, 2021, FBI's SWAT Team executed a federal search warrant issued in the United States Court for the Northern District of Oklahoma (21-MJ-573-JFJ), on ANDERSON's residence, 2033 East 133rd Place South, Bixby, Oklahoma. The purpose of the warrant was to collect evidence from LOVE's kidnapping. Although ANDERSON was not present at the residence when the warrant was served, a copy of the search warrant was left inside the residence.

12. One of the items collected and later reviewed was video surveillance from security systems at a residence near 2033 East 133rd Place South, Bixby, Oklahoma. Upon review of the video recorded at the date and time that LOVE was kidnapped, assaulted, and shot; case agents determined that LOVE arrived and entered the residence. A short time later, several other unidentified subjects also arrived and entered the residence. Later, the subjects backed LOVE's vehicle inside the garage of the residence and exited a short time later. Case agents also determined a vehicle belonging to ANDERSON was at her residence when these events occurred.

13. On August 15, 2021, ANDERSON met with a case agent and Assistant United States Attorney Heatherman to discuss why an FBI SWAT Team executed a search warrant at her residence. The meeting was facilitated after the case agent called ANDERSON at phone number (918)378-3744. ANDERSON told me that LOVE entered her residence then immediately went to use her restroom. Anderson

5

stated a short time later, "LOVE's people come in," prior to the "people" leaving and later returning to ANDERSON's residence. After ANDERSON explained the above facts, ANDERSON became visibly upset and ended the conversation. ANDERSON has not responded to additional attempts by case agents to speak with her about the events which occurred at her residence and has since fled to Houston, Texas.

**Cooperating Defendant Interview**

14. On May 11, 2022, FBI Tulsa met with a Cooperating Defendant (CD), with close and intimate knowledge of PRICE. CD divulged that she received information from PRICE that PRICE was involved with the restraining, kidnapping, and shooting of LOVE on Oklahoma Highway 75 near Jenks, Oklahoma.

15. The CD informed Agents that PRICE and Love were close friends since childhood. They are also members together of a criminal street gang called the Hoover Crips. CD explained that PRICE thought LOVE cooperated against him with Law Enforcement while LOVE was incarcerated in the Oklahoma Department of Corrections (OK DOC). CD explained that this placed a strain on their relationship because informing on one another is against gang rules.

16. According to the CD, PRICE thought LOVE would logically assume that PRICE was going to kill him for cooperating. Therefore, PRICE thought that LOVE was going to try to kill him first. Thus, CD understood that each party (PRICE & LOVE), felt that they had to act first against one another.

17. Furthermore, according to the CD, PRICE has a child with ANDERSON that lives at the Bixby residence. The CD explained that PRICE knew of LOVE's intimate relationship with ANDERSON in the past. The CD believes that this relationship angered PRICE and that ANDERSON purposely told PRICE of her relationship with LOVE to set up the violent incident against LOVE.

18. The CD explained that on the night of the Love's kidnapping and shooting on August 10th 2021, PRICE was in communication with ANDERSON via Facebook Audio. CD explained that PRICE believed Facebook Audio was "secure." The CD understood that these communications were in furtherance of PRICE and ANDERSON's conspiracy to kidnap and murder LOVE.

19. The CD explained that she heard PRICE later say that ANDERSON invited LOVE over to the residence to initiate the violent incident. Moreover, the CD heard PRICE say that PRICE and other Hoover Crip gang members zip-tied Love and placed him into a vehicle trunk, naked.

20. Based on what the CD heard from PRICE, CD believes that at the time of LOVE escaping the vehicle trunk, PRICE was driving the vehicle. Additionally, the CD understood there to be additional occupants of the subject vehicle who exited the vehicle and shot LOVE an undetermined number of times. After the shooting, LOVE fell to the ground and PRICE though LOVE was dead. PRICE and the other subjects then fled the scene in the subject vehicle. Law Enforcement (LE) later determined the vehicle to be LOVE's rental vehicle.

7

21. On April 12th, 2022, after discovering a State of Oklahoma warrant for Murder in the First Degree against PRICE, the CD willingly transported PRICE across state lines to Colorado to avoid LE apprehension. The CD also provided PRICE with $5000.00 USD for living expenses. Prior to fleeing the State of Oklahoma, PRICE abandoned the above-described blue Apple iPhone at CD's family members house. According to the CD, this Device was in PRICE's possession at the time of the August 10th 2021 kidnapping and attempted murder of LOVE. On May 11, 2022, the CD voluntarily provided the Device to Agents.

22. The Device is currently in the lawful possession of the Federal Bureau of Investigation (FBI), Tulsa Resident Agency (TRA), 8023 E. 63rd Place, Tulsa, Oklahoma, 74137. It came into the Agency's possession in the following way:  On May 11, 2022, FBI Tulsa met with a Cooperating Defendant (CD) who brought a phone that she said was abandoned at her family member's house. CD voluntarily gave the device to the FBI.

23. The Device is currently in storage at 8023 E. 63rd Place, Tulsa, Oklahoma, 74137. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

### Technical Terms

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

8

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various

9

types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as

10

wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities, including assault, attempted murder, kidnapping, robbery, conspiracy, firearm violations, and misprision. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential

illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages and emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

28. I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Whatsapp," "GroupMe," and "Facebook Audio." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include assault, attempted murder, kidnapping, robbery, conspiracy, firearm violations, and misprision.

29. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice

13

messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a

dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

19. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the

15

crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

### Conclusion

20. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

21. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to

disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Bennett E. Forrest
Special Agent
Federal Bureau of Investigations

Subscribed and sworn to by phone on May 19 , 2022.

Susan E. Huntsman
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

### Property to be Searched

The property to be searched is a blue Apple iPhone, contained in a blue iPhone protective case, hereinafter the "Device." The Device is currently located at 1. Federal Bureau of Investigation (FBI), Tulsa Resident Agency (TRA), 8023 E. 63rd Place, Tulsa, Oklahoma, 74137.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

All records on the Device(s) described in Attachment A that relate to violations of

18 U.S.C. §§ 1151, 1152, and 1113 (Attempted Murder in Indian Country); 18

U.S.C. §§ 1151, 1152, and 1201 (Kidnapping in Indian Country); 18 U.S.C. §§ 1151,

1152, 2111 and 2 (Robbery in Indian Country); 18 U.S.C. § 371 (Conspiracy to

Commit a Federal Offense); and 18 U.S.C. § 924(o) (Conspiracy to Possess Firearms

in Furtherance of a Crime of Violence) involving CHRISTOPHER ANTONIO

PRICE, AKA "Quartertop," "Tashonna L. ANDERSON, AKA "Isyss," JAIDEN

ANTHONY WALTERS, AKA "Drama," and Terrance Lamont MAYS, AKA

"Meatball" including:

1. Records relating to communication with others as to the criminal offense(s)
   listed above; including incoming and outgoing voice messages; text messages;
   emails; multimedia messages; applications that serve to allow parties to
   communicate; all call logs; secondary phone number accounts, including those
   derived from Skype, Line 2, Google Voice, Facebook Audio, and other
   applications that can assign roaming phone numbers; and other Internet-based
   communication media;

2. Records relating to documentation or memorialization of the criminal
   offense(s) listed above, including voice memos, photographs, videos, and other
   audio and video media, including Exchangeable Image File ("EXIF") data
   and any other metadata associated with those photos and videos, including

device information, geotagging information, and information about the

creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s)
above, including Internet activity, firewall logs, caches, browser history, and
cookies, "bookmarked" or "favorite" web pages, search terms that the user
entered into any Internet search engine, records of user-typed web addresses,
account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) listed above;

5. Threatening communications related to the criminal offense(s) listed above;

6. Evidence of user attribution showing who used or owned the Device(s) at the
time the things described in this warrant were created, edited, or deleted, such
as logs, phone books, saved usernames and passwords, documents, and
browsing history;

7. All records and information related to the geolocation of the Device(s) and
travel in furtherance of the criminal offense(s) listed above; and

8. All records and information related to the coordination, agreement,
collaboration, and concerted effort of and with others to violate the criminal
statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing
items of evidence in whatever form and by whatever means they may have been

3

created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4